IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Paul D. Morris,

      Plaintiff,

    v.                    Case No. 2:07-cv-183

American Electric Power
System Long-Term
Disability Plan,

      Defendant.

OPINION AND ORDER

This is an action for recovery of benefits filed pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(1)(B) by plaintiff Paul D. Morris against the American Electric Power System Long-Term Disability Plan ("the Plan"). The Plan is an ERISA employee benefit plan sponsored by American Electric Power, the Plan administrator. See General Benefits Information ("the general summary"), Administrative Record ("AR") 23. American Electric Power has delegated the responsibility of administering the Plan claim procedures to Broadspire Services, Inc. ("Broadspire"). See Long-Term Disability ("LTD") Plan Summary ("Plan Summary"), AR 66. The Plan at issue in this case is the version of the Plan which went into effect on January 1, 2005. See id. ("[T]his plan governs the ability of employees to continue receiving LTD benefits that were originally approved under any prior American Electric Power System long-term disability plan[.]").

This matter is before the court on the parties' cross-motions for judgment on the administrative record.

I. Standard of Review

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Supreme Court held that a denial of benefits challenged under §1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case the more deferential arbitrary and capricious standard of review applies. In this case, the plan administrator and its representative or claims administrator have the authority to control and manage the operation of the plan, interpret, construe and administer the plan, make determinations regarding eligibility for benefits, evaluate and determine the validity of benefit claims, and resolve all claims and disputes regarding the right and entitlement of participants to receive benefits and payments pursuant to the plans. General Benefits Information, AR 24; Plan Summary, AR 70 ("Broadspire has full discretion and authority to determine eligibility for benefits and for continued benefits and to construe and interpret all terms and provisions of the plan."). Thus, the "arbitrary and capricious" standard of review applies.

The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 169 (6th cir. 2003). Under the arbitrary and capricious standard, a determination by the plan administrator will be upheld if it is rational in light of the plan's provisions. Id; Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381 (6th Cir. 1996). When it is possible to offer a reasoned explanation for a plan administrator's decision based upon

the evidence, that decision is not arbitrary and capricious. McDonald, 347 F.3d at 169; Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989). However, a district court's obligation to review the administrative record "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues" to avoid becoming "nothing more than rubber stamps for any plan administrator's decision[.]" McDonald, 347 F.3d at 172.

In reviewing the administrator's decision, the court is limited to a consideration of the evidence which was included in the record before the plan administrator. See Shelby County Health Care Corp. v. Southern Council of Industrial Workers Health & Welfare Trust Fund, 203 F.3d 926, 932 (6th Cir. 2000); Smith v. Ameritech, 129 F.3d 857, 963 (6th Cir. 1997).

"Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision. McDonald, 347 F.3d at 169. A plan administrator is not required to accord special weight to the opinions of the plaintiff's treating physician, or to offer an explanation when it credits reliable evidence that conflicts with a treating physician's evaluation. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003); Calvert v. Firstar Finance, Inc., 409 F.3d 286, 293 (6th Cir. 2005)("treating physician rule" does not apply in the ERISA context).

The Plan is a self-insured plan, meaning that contributions to the Plan are made solely by American Electric Power, and benefits are paid either directly by the company or through trusts administered by the company.  General Benefits Information, AR 13, 21.  An employer's operation of a plan both as the insurer and the administrator creates a conflict of interest.  <u>Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston</u>, 419 F.3d 501, 506 (6th Cir. 2005); <u>Killian v. Healthsource Provident Adm'rs, Inc.</u>, 152 F.3d 514, 521 (6th Cir. 1998).  However, such a situation does not alter the degree of deference granted under the arbitrary and capricious standard of review; rather, the conflict must be weighed as a factor in determining whether an abuse of discretion occurred.  <u>Kalish</u>, 419 F.3d at 506 (citing <u>Firestone Tire & Rubber Co.</u>, 489 U.S. at 115); <u>Calvert</u>, 409 F.3d at 292-93 (arbitrary and capricious standard remains unchanged, and conflict of interest is considered in applying that standard).

<u>II. Plan Provisions</u>

Under the terms of the Plan, LTD benefits are payable for disability due to illness or injury following an elimination period.  Plan Summary, AR 57.  "LTD benefit payments can continue for as long as you remain disabled, but usually will end no later than age 65.  If you are age 62 or older when you become disabled, your maximum benefit period may continue beyond age 65."  <u>Id</u>.

To receive benefits, the employee must meet the Plan's definition of disability.  Plan Summary, AR 57.  After the first 24 months following the onset of disability, the term "disability" is defined as

> an illness or injury that requires the regular treatment
> of a duly qualified physician that may reasonably be

4

expected to prevent you from performing the duties of any occupation for which you are reasonably qualified by your education, training and experience.

Plan Summary, AR 58.

The Plan further states, "If you meet the requirements of this "two-year test," you will continue to be considered to be disabled and receive benefits up to the maximum benefit period." <u>Id</u>. Plaintiff argues that once he satisfied the two-year test, his benefits could never be terminated.  However, this language, when considered in light of other terms, does not mean that an employee who is awarded disability benefits may continue to receive benefits even if he subsequently no longer meets the requirements of the definition of "disability."  The Plan states that disability benefits will continue until the earlier of the date the employee is no longer disabled, dies, reaches the age of 65, or begins receiving benefits under a company retirement plan.  Plan Summary, AR 62.  Eligibility to receive benefits ends as of the "date you fail to submit satisfactory, written proof of objective medical information relating to your illness or injury which supports a functional impairment that renders you to be disabled."  Plan Summary, AR 63.

To qualify for benefits, the Plan further provides:

[Y]ou must be under the regular and continuing care of a doctor who is not a member of your immediate family.  To continue receiving benefits, you will be required to provide continuing proof of your disability at least once each year.  Objective medical evidence must be supplied supporting your case for disability.  A letter from your treating physician merely stating that you are unable to work without any supporting information will not be considered as conclusive proof of your disability.

Plan Summary, AR 65.  Thus, the Plan clearly provides for a

5

mechanism of annual review at which time the recipient of benefits is obligated to furnish proof of present disability.

The Plan provides for a two-tiered appeals procedure. A denial of benefits may be appealed to the Broadspire Claim Appeals Unit, and the claimant is permitted to present additional information and documentation in support of the appeal. Plan Summary, AR 67. This first level appeal affords no deference to the initial benefit determination, and the review is conducted by someone other than the individual who made the initial benefit determination. Plan Summary, AR 68. Broadspire also ensures that a health care professional with appropriate training and experience is consulted during the appeal. Id.

The Plan also provides for a second and final level appeal, which also affords no deference to prior determinations, and is conducted by an individual not previously involved in the review process. Plan Summary, AR 69. The claimant is permitted to produce additional information and documentation at this appeal. Id. Broadspire is required to consult with a health care professional not previously involved in the review of the claim. Id.

III. Administrative Record

The record reveals that plaintiff applied for LTD benefits on June 3, 1993, as a result of injuries sustained in an automobile accident on August 4, 1992. Plaintiff filed a workers' compensation claim for cervical and lumbar strain, multi-level degenerative disc disease, lumbosacral spine, and lumbar radiculopathy. While receiving disability benefits, plaintiff was in a second automobile accident on February 8, 1994, which was the

6

result of a seizure he had while driving.  AR 838, 845.  Plaintiff was treated with anti-seizure medication by Dr. Nahid Dadmehr, a neurologist, and was diagnosed by Dr. Ruth Aharoni as having major depression and Post Traumatic Stress Disorder.  AR 786, 819-820.

By letter dated June 23, 2004, a Broadspire claim specialist asked plaintiff to complete an LTD resource questionnaire and an "attending Physician Statement and evaluation of Physical Abilities" form and to submit medical records from May 2003 through June 23, 2004, as proof of continued disability by July 31, 2004. AR 108.  By letter dated November 1, 2004, Broadspire again asked plaintiff to complete the questionnaire and attending physician statement and to submit medical records from April 2004 through November 1, 2004.  AR 106.  In a letter dated December 29, 2004, Broadspire reminded plaintiff of his obligation under the Plan that his benefits would cease if he failed to provide written satisfactory proof of disability, and noted that plaintiff had not responded to the previous requests for information.  AR 97.  In response, plaintiff submitted the completed questionnaire.  AR 87-95.  Plaintiff described the various limitations on his activities due to his back and leg pain, and indicated that he still had nightmares, panic attacks, depression and irritability.  He stated that he was able to walk for an hour once a week while shopping for food, drive for up to 1.5 hours, lift or carry not more than 8 to 10 pounds, sit without moving for 30 to 45 minutes, play 30 to 60 minutes with his grandson, and go up and down the stairs to his basement workshop, where he works on remote control boats and planes, although this causes pain in his right leg.

Plaintiff also submitted an attending physician form completed

7

by Dr. Dadmehr.  AR 99.  She checked the box indicating that plaintiff was unable to work, and noted that plaintiff's symptoms included moderately decreased range of motion in the lower extremity, moderate tenderness over the paraspinal muscles, sciatic notch tenderness on the right, and weakness.  On a separate evaluation form, Dr. Dadmehr noted that plaintiff was capable of sedentary lifting; light carrying, pushing, pulling, stooping, crouching, crawling and climbing stairs; medium left front and overhead reaching, walking, standing, sitting, kneeling, balance, left handling, right-hand fingering and repetitive movement; and heavy right front reaching, and right handling and fingering.

Plaintiff also submitted a clinician statement completed by his treating psychiatrist, Dr. Maureen Stark, dated December 11, 2004.  AR 101-102.  Dr. Stark indicated that she had not recommended that plaintiff be off work.  She noted that plaintiff's cognitive functioning was "OK" and that plaintiff presented a normal affect, but reported "mild anxiety episodes under certain circumstances occasionally."  Plaintiff responded appropriately during the session but reported a history of occasional episodes of anger, fighting, and irritability.  Plaintiff reported that he doesn't socialize much and is uncomfortable in crowds, but that he operates a motor vehicle and performs routine shopping.  Dr. Stark described the medication plaintiff was taking.  She diagnosed plaintiff as suffering from Bipolar II Disorder, with physical problems which included seizure disorder, diabetes, hypothyroidism, and back problems.  She stated, "His disability is more physical than psychiatric.  From a psychiatric perspective, he might be able to perform part-time, low stress work."  AR 102.

8

The Plan requested that plaintiff complete a functional capacity evaluation, which was conducted by Jessica M. Iams, M.S.P.T., of Ohio Diagnostic Services on June 21, 2005. She reported that plaintiff "is functioning in the Medium Physical Demand Category." AR 149. Ms. Iams stated that plaintiff "is limited by reported pain and likely has abilities at or equal to those performed this date. He appears rehabable if pain can be controlled." AR 149. Her recommendations included "frequent change in position, allowances for self management of symptoms while working or exercising, and some type of work conditioning program" to facilitate a return to regular duty work. The report indicates that plaintiff was capable of lifting 40 pounds occasionally, and carrying 25 pounds occasionally; frequent walking, crouching, reaching, fingering, sitting and standing; and constant handling. AR 150.

The Plan also arranged for plaintiff to undergo an independent medical examination by Dr. Don McIntire, Ph.D., a psychologist. AR 122-130. Dr. McIntire reviewed Dr. Dadmehr's attending physician's statement dated December 20, 2004, and the questionnaire and notes prepared by plaintiff. AR 122. He diagnosed plaintiff as having moderate Bipolar II Disorder, mild Post Traumatic Stress Disorder, with the psychosocial stressors of chronic pain, unemployment, and multiple medical problems. AR 129. Plaintiff tested within the average range for overall intellectual functioning. AR 127. Dr. McIntire noted that plaintiff did not exhibit any clinically significant behavioral impairments during the evaluation; his social behavior was "quite good;" he had difficulty pronouncing some words but was generally able to communicate relatively well;

psychomotor activity was within normal limits, and he exhibited no difficulties with impulse control or controlling his emotions; and he had no difficulty with composure during the evaluation. AR 129. Dr. McIntire further reported that plaintiff has "significant difficulties with depression and anxiety" and "is also likely to be uncomfortable in being around other people." However, he "exhibited no difficulties with overall intellectual functioning, attention, concentration, or memory problems in comparison to standardized norms." Plaintiff experienced mild difficulties on a specific test measuring working memory abilities, but exhibited no difficulties with reality testing. AR 129.

The Plan submitted the information provided by plaintiff, including the questionnaire and the reports of Dr. Dadmehr and Dr. Stark, along with the functional capacity evaluation and Dr. McIntire's report to Dr. Vaughn Cohan, a neurologist, for a peer review. AR 206-208. In a report dated July 29, 2005, Dr. Cohan noted that numerous tests performed during the functional capacity evaluation "demonstrated results suggestive of submaximal and self-limited effort" and that the finding that plaintiff was capable of performing work at a medium physical demand classification should be considered a minimum level of functionality "as he performed submaximally on many of the tests which were administered." AR 207, 208. Dr. Cohan also noted the lack of medical records providing objective documentation of a functional impairment which would preclude work, and that the objective exam findings which were available were not incompatible with performance of sedentary or light work. Dr. Cohan offered the opinion, based on the documentation provided, that plaintiff's limitations would be

10

consistent with sedentary or light work. AR 207. He further stated that a comprehensive and quantified report of the plaintiff's orthopedic and neurologic physical exam findings would be helpful. AR 207-208. Dr. Cohan also stated that there was no evidence that the medications plaintiff was taking would have an adverse impact on his ability to work because his cognitive function was described as normal. AR 208. Dr. Cohan determined that the evidence submitted failed to support impairment for the entire time frame. AR 206.

Another peer review based on the above information was performed by Dr. Barry M. Glassman, a psychiatrist, on July 28, 2005. AR 216-218. Dr. Glassman commented on the reports of Dr. Stark and Dr. McIntire, and concluded that the "submitted documentation fails to proved examination data that would support a functional incapacity in the cognitive behavioral, or emotional sphere that would preclude the claimant from performing any work from 7/28/2005 going forward." AR 217. He concluded that plaintiff "most likely would be successful in performing in a low stress, nonphysically demanding position" although "there were no examination findings to indicate this would be medically necessary." AR 218. He also agreed that no significant behavioral impairments were apparent from Dr. McIntire's evaluation, and that there was no indication that plaintiff's current medications would negatively impact his capacity to work. AR 218.

Broadspire also prepared an employment assessment report, dated September 15, 2005, which considered the above physician's reports and documentation. AR 179-185. Plaintiff was also interviewed. He reported that he has constant sharp, stabbing low

11

back and occasional right leg pain that causes his leg to give out. He stated that he can drive up to 45 minutes continuously and up to two hours per day. Plaintiff stated that he reads, builds models, and watches television, and that he is able to perform his own personal care. Plaintiff stated that he can sit and stand for 30 minutes, walk for 45 minutes, and lift five pounds occasionally, and two pounds frequently. He reported difficulty climbing stairs. He also stated that he gets nervous, anxious, and shakes, and that he has difficulty concentrating, and that wet environments cause him to hyperventilate. Plaintiff indicated that he cannot be around moving machinery because he perceives things as moving when they are not, and that he does not get along with people. AR 180. The report indicates that plaintiff completed high school and worked as a military policeman in the service. He was employed by American Electric Power as a meter reader. Plaintiff reported that he likes plastic models, and he owns a radial saw, band saw, drill press, power sander and drill. He stated that he would be interested in a sales position in a hobby shop if he could earn enough money. AR 181.

The preparers of the employment assessment report consulted the Dictionary of Occupational Titles, the Guide for Occupational Exploration, Classification of Jobs, the OASYS computer program, and the Occupational Outlook Handbook. The report identified two job titles, Automatic Presser and Shirt Presser, which are available in the Columbus, Ohio, area and met the necessary salary and physical requirements. AR 184.

By letter dated October 7, 2005, Broadspire notified plaintiff that his disability benefits were being terminated. AR 73-75. The

letter notes the documentation reviewed by the Plan, including the peer review reports which concluded that plaintiff was capable of employment with a sedentary to light level of physical demand. AR 73. Plaintiff was advised that in light of the vocational report, he was no longer totally disabled as defined in the Plan. Plaintiff was advised of his right to appeal, and was asked to submit "medical documentation which includes clinical data that supports disability," including any physical examination findings, diagnostic test results, diagnoses, x-ray results, observations of anatomical, physiological or psychological abnormalities, and information concerning medication and treatment plans. AR 74.

By letter from his attorney dated October 19, 2005, plaintiff notified Broadspire of his intent to appeal. AR 535. Plaintiff submitted a letter from Dr. Dadmehr dated January 6, 2006. AR 335. Dr. Dadmehr stated that she had been treating plaintiff since February of 1994 for back pain, chronic right sciatica, and partial seizures, and that plaintiff's chronic back and right lower extremity pain had worsened during the past few years based on neurological exam and MRI findings. She reported that plaintiff has had physical therapy, used a TENS unit, and taken muscle relaxers without noticeable improvement, and that he complained his back pain was worse with prolonged sitting, walking and standing. She concluded, "Considering the fact that the patient has been on disability for almost two decades,[1] patient's age, other co-morbid illnesses, educational background and the fact that the patient's pain gets aggravated by minimal physical activities it is my

---

[1]Technically, as of the date of this letter, plaintiff had been receiving disability benefits for approximately 12-1/2 years, since June of 1993.

13

medical opinion that this patient is not a good candidate for vocational rehabilitation[.]"

Plaintiff also submitted Dr. Dadmehr's office notes from August 24, 1999, through October 11, 2005. The record for October 11, 2005, indicates that plaintiff "does not report any recurrent syncopes since his discharge from St. Ann's Hospital" but no hospital records were submitted at this time. AR 268. The records contain no other reports of seizures, as plaintiff was taking anti-seizure medication, which he was able to tolerate without any problems. AR 271-272. The office note for July 7, 1997, indicates that plaintiff's "EEG is not quite suggestive of seizure disorder." AR 289. Most recently, plaintiff complained of back and elbow pain. AR 272. However, the report for May 10, 2005, states that plaintiff was wearing an elbow support which controlled the right elbow pain, and that plaintiff's neuropathic pain "has not worsened in the past six months." AR 269. That report also indicates that plaintiff's range of motion "continued to be mild to moderately limited in [the] lumbar spine" and that plaintiff stated he was not interested in getting a follow-up MRI. From 2002 through January of 2006, plaintiff saw Dr. Dadmehr three times a year, and no diagnostic tests were ordered during that time.

Plaintiff also submitted the treatment notes of Dr. Stark from February 2004 and December 21, 2005. AR 338-409. These records included a report dated January 7, 2006, regarding plaintiff's psychiatric problems. AR 336-337. Dr. Stark indicated that plaintiff is taking medication for his bipolar II Disorder, and has some fluctuation of mood, related at times to some irregularity in his medication compliance. She further stated that plaintiff's

mood had been fairly stable until he learned that his disability
payments were discontinued.  She noted that he does not like being
in crowds, and that in the past he had anger episodes during which
he has assaulted someone, but this has been controlled with
medication, although he "has had some verbal outbursts on
occasion."  AR 336-37.  He also has symptoms of agoraphobia on
occasions.  Dr. Stark further stated that plaintiff feels fairly
content in his own small world" and "everything was running
smooth."  AR 337.  Plaintiff is able to care for his grandson and
to visit with his mother and assist her, such as by taking her to
her doctor's appointments when she is ill, and he is involved with
his grandson's school and other activities.  However, he sometimes
has difficulty concentrating.  Dr. Stark concluded by stating that
she thought plaintiff could attempt some low stress part-time work
with minimal interaction with coworkers or supervisors, but that
she doubted that he could perform for long periods on a consistent
basis.  AR 337.

Dr. Stark's treatment notes for January 4, 2005, indicate that
plaintiff was "fairly stable" and that he could go for six weeks
until his next appointment.  AR 349.  In her notes for July 20,
2005, Dr. Stark noted that plaintiff "seems to be coping with the
stressors he has.  He appears to be stable on Remeron 45 mg and
Celexa 50 mg."  AR 344.  The notes for December 21, 2005, indicate
that plaintiff was stressed about his financial situation after the
Plan informed him that he might not qualify for continuing
benefits, but Dr. Stark stated, "He seems to be doing as well as
can be expected."  She continued him on Remeron 30 mg. and Celexa
50 mg.  AR 338.

Following the receipt of plaintiff's additional records, the Plan obtained a peer review of the plaintiff's records, including what appears to be plaintiff's original claim file with records dating back to 1993, by Dr. Elana Mendelssohn, Psy.D., a specialist in clinical and neuropsychology. AR 562-567. In her report dated March 17, 2006, Dr. Mendelssohn noted that limited clinical information was submitted. AR 564. She summarized Dr. Stark's notes for late 2005, noting that although plaintiff was worried about the loss of disability benefits and his mood was down and irritable, Dr. Stark reported that plaintiff was pleasant and cooperative, and his medications were not changed. Dr. Mendelssohn commented that Dr. Stark's letter dated January 7, 2006, "did not provide findings to substantiate impairment in cognitive, emotional, or behavioral functioning that would preclude the claimant from performing any occupation." AR 565.

Dr. Mendelssohn also noted Dr. McIntire's report, which indicated that plaintiff did not show difficulties with overall intellectual functioning, attention, concentration, or memory. Dr. Mendelssohn stated that although the submitted documentation suggested a history of emotional difficulties, Dr. McIntire's examination findings did not substantiate the presence of impairment in psychological functioning. She also noted that Dr. Stark's information did not contain examination findings describing a psychological condition impacting the plaintiff's functioning to a degree to preclude him from performing any occupation, and that there was no indication of medication side effects which would impact plaintiff's ability to work. AR 565-66. Dr. Mendelssohn's opinion was that the information did not support a functional

16

impairment from "any occupation" beyond 11/12/05 forward.  AR 566.
She noted that additional documentation in support of the claim
could include the results of a formal mental status examination,
performance-based tests of psychological functioning with
standardized scores, or behavioral observations, including the
frequency, duration and intensity of symptoms observed.  AR 566.

Plaintiff's records were also reviewed by Dr. Henry Spira, a
neurologist, who was asked to evaluate plaintiff's functional
impairment for any occupation from November 12, 2005, forward.  AR
546-552.  In a report dated March 20, 2006, Dr. Spira noted that
plaintiff's neurological visits over the years always indicated no
change from the previous visit, and that no objective neurological
abnormalities were reported by the neurologist during the
examinations.  AR 549.  Dr. Spira noted that an MRI of the lumbar
spine in March 2000 showed focal bulging at L5S1 with mild
neuroforaminal narrowing, and that a 2001 electromyogram showed
early carpal tunnel syndrome on the right.  However, Dr. Spira
concluded that plaintiff's chronic sciatica and low back pain are
not substantiated by any abnormality on electrodiagnostic testing
or MRI that would preclude him from working, and that the possible
seizure disorder treated with medication would not support a
functional impairment.  Dr. Spira opined that there was no
objective evidence to support functional impairment which would
keep plaintiff from working in any occupation from November 12,
2005, onward.  AR 549.

The Plan also obtained a peer review from Dr. Lawrence
Blumberg, an orthopedist.  AR 553-556.  In a report dated March 20,
2006, Dr. Blumberg noted that the 2000 MRI showed minimal narrowing

of both neural foramina at L5-S1, but no evidence of central canal stenosis. AR 555. He observed that Dr. Dadmehr's examination of May 10, 2005, revealed "mild-to-moderately limited motion of the lumbar spine" but that no specific degrees of motion were noted. Dr. Blumberg concluded that the records failed to support a functional impairment that precludes work for any occupation, noting that plaintiff can sit, stand, ambulate, and lift up to 8 to 10 pounds on a regular basis. AR 556. Dr. Blumberg noted that additional clinical documentation which would be helpful for the evaluation of the claim would be a current complete physical examination with range of motion testing, motor strength testing, and any neurological findings. AR 556.

The Plan also obtained a peer review of plaintiff's records by Dr. Tamara Bowman, a specialist in internal medicine. AR 557-561. Dr. Bowman noted that although plaintiff's EEG "was not quite suggestive of a seizure disorder," he was maintained on Depakote, and he remained seizure free despite being on a sub-therapeutic Depakote level. AR 559-60. She also noted that plaintiff had a symmetrical distal sensorimotor polyneuropathy secondary to diabetes "which is notably asymptomatic except for one mention of some tingling sensation in the claimant's right foot on occasion." AR 560. Although Dr. Dadmehr's notes indicated that she was arranging for a tilt table test for possible orthostatic hypotension, the results of this test, if any, were not provided. Dr. Bowman commented that no blood sugar values were provided for review to determine the degree of control plaintiff has regarding his diabetes, which was being treated with oral medication, and that there was no documentation of severe hyperglycemia or frequent

hypoglycemic events requiring emergency room treatment or hospitalization. AR 560-561. Plaintiff was diagnosed with mild peripheral diabetic polyneuropathy which is "essentially asymptomatic." AR 561.

Dr. Bowman also found that there was no evidence of a cardiac condition, orthostatic hypotension or arrhythmia, and noted that although plaintiff was on thyroid hormone replacement due to hypothyroidism, there was no documentation of clinical signs of hyperthyroidism or hypothyroidism in the recent past. She noted that there was no documentation of side effects due to any of plaintiff's medications. Dr. Bowman concluded, "There is no documentation of objective physical exam findings, lab abnormalities or radiographic findings to support a functional deficit that would preclude the performance of any occupation, from an internal medicine standpoint." AR 561. She noted that additional clinical information relevant to the claim would include a recent complete physical exam with special attention to any evidence of organ damage secondary to hypertension or diabetes, recent blood pressure and blood sugar readings, thyroid function studies, and documentation of any recurrence of seizure activities or syncopal episodes. AR 561.

By letter dated March 24, 2006, Broadspire advised plaintiff that his appeal was being denied. AR 261-265. The letter included a lengthy list of the information which was reviewed. The letter discusses Dr. Dadmehr's notes, the functional capacity evaluation, Dr. Stark's notes, and the employability assessment, and concludes, "Based on a review of the aforementioned medical data, there is a lack of medical evidence to substantiate [plaintiff's] inability to

perform any occupation." AR 264. Plaintiff was advised of his right to a further appeal, including the right to submit additional information, including medical and psychiatric data, examination findings, and diagnostic test results. AR 265.

By letter dated May 22, 2006, plaintiff's counsel advised Broadspire of plaintiff's intent to appeal the decision of March 24, 2006. AR 592-655. Plaintiff submitted documents which had already been considered by the Plan, as well as office notes from Dr. Dadmehr from December 27, 2005, to April 6, 2006. AR 614-615. The office notes from December 27, 2005, refer to a treadmill study which was "unremarkable." AR 614. Plaintiff complained of back pain radiating to the left leg, but had no new neurological complaints. He reported that his insulin dosage had been increased. The notes also state that plaintiff had "moderate limited ROM of the lumbar spine, moderate tenderness over lumbar paraspinal muscles and slight weakness of proximal muscles of the lower extremities more so on the left side" and that sitting leg raising was "mildly positive on the left and within normal limit on the right." Plaintiff was advised to increase his seizure medication to have a higher therapeutic level. The treatment notes for April 6, 2006, indicate that plaintiff complained of back pain radiating to his legs, more on the right side, and a tingling sensation at the bottom of his feet almost all the time, but no other new neurological symptoms. AR 615. Dr. Dadmehr notes that no MRI would be obtained at this time because plaintiff was not considering surgery.

Plaintiff also submitted the records from his hospitalization at St. Ann's Hospital on September 29, 2005. AR 635-653. The

records indicate that plaintiff lost consciousness after going to the bathroom in the morning.  AR 636.  Dr. Dadmehr's report of September 30, 2005, states that plaintiff had a CT scan of the brain "that reportedly revealed no acute changes."  AR 650.  She reported that plaintiff "does not report any new neurological symptoms" and "feels that he is almost back to baseline."  AR 651.  No seizure-like activity or arrhythmia were noted.  AR 651.  The examination results were largely unremarkable except for a white blood count of 11.o and a slightly reduced potassium level.  AR 52.  Dr. Dadmehr saw plaintiff after this incident on October 11, 2005, and noted that his neurological exam was unchanged since his previous evaluation.  AR 613.  She continued plaintiff on Depakote and advised him to be cautious while driving.

In light of the new information provided by plaintiff, the Plan obtained a peer review by Dr. Martin Mendelssohn, a specialist in orthopedics.  In a report dated June 20, 2006, Dr. Mendelssohn noted that after plaintiff's motor vehicle accident in 1992, an MRI revealed no evidence for herniation, and he was treated conservatively by Dr. Dadmehr for an extended period of time.  AR 659.  Plaintiff was also treated conservatively for an elbow problem, possible ulnar neuropathy.  Plaintiff was never referred to an orthopedic surgeon or neurosurgeon for either of these problems.  Dr. Mendelssohn also noted that plaintiff had another motor vehicle accident on February 8, 1994, in which he sustained a nasal fracture, but there was no indication that he had an aggravation of his low back pain as a result of the second accident.  AR 659.  Dr. Mendelssohn referred to the MRI of the lumbosacral spine on March 21, 2002, which revealed a minimally

21

circumferential bulge at L3-4, a mild circumferential bulge at L4-5, and a focal bulge at L5-S1, with minimal narrowing, but no evidence of central canal stenosis.

Dr. Mendelssohn also commented on Dr. Dadmehr's physical examination of May 10, 2005, which revealed "mild-to-moderate limitation of lumbar flexion, but this was not quantified." AR 659. Dr. Mendelssohn stated that "although the claimant has persistent low back pain with radiation, diagnostic tests are nonfocal. Comprehensive examination reveals only minimal restriction of motion." AR 660. Noting the functional capacity evaluation, he concluded that "a functional impairment that would preclude the claimant from any occupation as of 11/12/2005 onward cannot be substantiated" and that "restrictions and limitations of a sedentary to light physical exertion level that will allow the claimant to change positions as needed are reasonable and permanent." AR 660. Dr. Mendelssohn also found that there was no indication that plaintiff's medications would impact his ability to work, and that plaintiff's subjective complaints would not preclude his ability to work. AR 660. He noted that information which would be helpful in evaluating the claim would include a re-evaluation of plaintiff's functional impairment, a comprehensive orthopedic and neurological evaluation with objective clinical findings and any supporting diagnostic tests. AR 660.

The Plan also obtained a peer review from Dr. Dennis Mazal, specializing in internal medicine and pulmonology. AR 662-666. In a report dated June 21, 2006, Dr. Mazal noted in particular records concerning plaintiff's blood pressure and the test results from St. Ann's hospital. AR 664. He referred to the fact that plaintiff

had a history of hypothyroidism and was on Synthroid therapy, and that plaintiff was thought to have a complex partial seizure versus micturition syncope. AR 665.

Upon reviewing plaintiff's file, Dr. Mazal concluded that "there is no support for a loss of functionality that would preclude the clamant from performing the essential duties of any occupation during the time period under consideration, 11/2/2005 and beyond." AR 665. Dr. Mazal noted, in regard to plaintiff's diabetes, that there was no documentation of recurring blood sugars greater than 400, or in the hypoglycemic range that have caused syncope. He also concluded that plaintiff's blood pressure recordings would not constitute a loss of functionality that would preclude him from performing the duties of any occupation. He further noted that although plaintiff had a history of hypothyroidism, including a markedly elevated TSH level at the time of his hospitalization in 2005, plaintiff was on medication for this condition, and a TSH level by itself would not preclude plaintiff from performing the duties of any occupation. AR 665. Dr. Mazal concluded that there would be "no restrictions or limitations at the workplace from an internal medicine viewpoint," that none of the plaintiff's medications had been documented to cause any significant side effects that would preclude work, and that none of plaintiff's subjective complaints would preclude work. AR 665.

The Plan also obtained a peer review from Dr. Lawrence Burstein, a psychologist. AR 667-672. In a report dated June 23, 2006, Dr. Burstein noted that "the documents related to the claimant's medical condition do not contain examples of the

23

claimant's behavior or measurements of the claimant's cognitive functioning that would support an impairment, from a psychological perspective, during the period in question." AR 669. Dr. Burstein referred to Dr. Stark's notes which "revealed that claimant's mood has been stable for several years." AR 669-70. Dr. Burstein also commented that even though plaintiff expressed fears in October of 2005 about his benefits being in jeopardy, he was able to continue his project of cleaning his basement and building his grandson a toy boat. AR 670.

Dr. Burstein noted that in October, November, and December of 2005, Dr. Stark reported plaintiff's subjective complaints, but did not provide any examination findings, examples of plaintiff's behavior or measurements of the plaintiff's cognitive functioning to support impairments that would preclude plaintiff from any occupation at all. AR 670. He also noted Dr. Stark's 2004 clinician statement, which did not contain examination findings documenting impairments in plaintiff's cognitive, emotional, or behavioral functioning, and in fact includes the statement that plaintiff would be able to work at least on a part-time basis from a psychiatric perspective. Dr. Burstein also reviewed Dr. Stark's letter of January 7, 2006. He notes that this letter also failed to provide examples of plaintiff's behavior or measurements of plaintiff's cognitive functioning to support measurements that would preclude plaintiff from working, and that the reference to agoraphobia appeared to be based solely on plaintiff's reports of being uncomfortable away from home, rather than her observations. AR 670.

Dr. Burstein also reviewed the report of the independent

psychological examination conducted by Dr. McIntire.  He noted that
the mental status examination and tests of plaintiff's intellectual
functioning did not reveal impairments that would preclude
plaintiff from working.  AR 671.  He also noted Dr. McIntire's
observations that plaintiff did not demonstrate any significant
behavioral impairments, that his social behavior was "quite good"
and that plaintiff had no difficulties controlling his emotions
during the evaluation.  AR 671.  Dr. Burstein concluded that the
record did not support impairments in plaintiff's psychological
functioning that would preclude him from any occupation.  He noted
that despite plaintiff's subjective complaints that he would be too
irritable and unable to interact with authority figures to function
in the work place, he did not exhibit any of these characteristics
while interacting with the independent examiner or his own
physicians.  AR 671.

The Plan also obtained a peer review by Dr. James Cimera, a
neurologist.  AR 673-677.  In a report dated June 28, 2006, Dr.
Cimera noted that an MRI of the brain was negative, that there had
been no further episodes of seizures since plaintiff was put on
medication, and that there was no documentation that plaintiff's
loss of consciousness in 2005 was a seizure.  AR 675.  Dr. Cimera
noted that despite plaintiff's complaints of chronic low back pain,
the neurological examinations have been unremarkable with the
exception of descriptions of reduced range of motion.  He observed
that two MRI scans of the lumbar spine have revealed degenerative
disc disease, but no herniated discs were reported, and that EMG
testing did not document any neuropathic abnormalities with the
exception of delayed H-reflex on the right side.  AR 675.  Dr.

25

Cimera noted that years ago, plaintiff complained about a problem
with his right hand which was diagnosed as possibly being carpal
tunnel syndrome, although nerve conduction studies were negative,
and the problem was resolved when plaintiff was treated for a time
with elbow pads.  AR 675-66.

Dr. Cimera concluded that there was no documentation or
objective evidence to support a functional impairment that would
limit light or sedentary activity in any occupation as of November
2005.  AR 676.  He noted that although plaintiff has made
subjective complaints of low back pain reportedly aggravated by
physical activity, he is able to drive up to thirty minutes at a
time, sit for prolonged periods and perform light activity.  Dr.
Cimera stated, "Repeated neurologic examinations have not
documented objective neurologic deficits and extensive neurologic
evaluation including MRIs and EMGs do not reveal objective evidence
of neurologic dysfunction related to the lumbosacral spine and/or
nerve root." AR 676.  Dr. Cimera also noted that since there had
been some question in the records about the diagnosis of epilepsy
made years ago, and since there has been no indication of any
recent seizures in many years, this would not be a current issue in
regard to plaintiff's employment.  Dr. Cimera agreed with the
recommendations in the Employability Assessment Report.  AR 676.

Plaintiff's appeal file was reviewed by the Broadspire Appeals
Committee.  By letter dated July 5, 2006, to plaintiff's counsel,
plaintiff was notified that his appeal was denied.  AR 574-576.
The letter noted the contents of the file under review, including
the information submitted by plaintiff, then stated the reasons for
the decision:

After a careful review of the aforementioned documentation, the Broadspire Appeals Committee has determined that there was a lack of sufficient recent medical evidence (i.e. a comprehensive orthopedic and neurological evaluation with clinical findings substantiating functional impairment, evidence of supporting diagnostic tests from his treating physician; current clinical assessment findings, to corroborate self-report inventories, of impairment(s) in the area of cognitive functioning, emotional functioning or behavioral control precluding work; detailed results of performance-based tests of psychological functioning with standardized scores; evidence of an observed formal thought disorder; detailed behavioral observations describing the frequency, severity and intensity of observed psychiatric symptoms, in objective mental status terms, to preclude work; evidence of at-risk behaviors reported or noted; documentation of any hypoglycemia with neurological sequelae, blood sugars over 400 with glycemic instability; evidence of any other complication of diabetes, such as retinopathy, nephropathy, neuropathy or ulceration; documentation of any cardiovascular or renal disease; documented medical evidence of any significant adverse effects or cognitive impairment your client experienced as a result of prescribed medication; etc.) to substantiate significant impairments in functioning which would have prevented Mr. Morris from performing the duties of any occupation as of 11/11/05.

AR 575-76.

## IV. Analysis

The record reveals that plaintiff was found to be ineligible for disability benefits following two appeals which included review of the office notes and other reports from two of plaintiff's treating physicians, a functional capacity examination, an independent psychological examination, an employability assessment and ten peer reviews.

Plaintiff argues that the decision to terminate benefits was influenced by a conflict of interest. The fact that the Plan is self-insured, when considered as a factor, is not sufficient to

27

render the Plan's decision arbitrary and capricious. In this case, there is no evidence that the Plan based its decision on the costs associated with plaintiff's disability benefits. See Peruzzi v. Summa Medical Plan, 137 F.3d 431, 433 (6th Cir. 1998). The fact that plaintiff received disability benefits for over ten years before his entitlement to benefits was brought into question during an annual review also weighs against a finding that any conflict of interest influenced the decision to terminate plaintiff's benefits.

Likewise, although the Plan arranged for peer review physicians to review the documents in the administrative record and offer an opinion on the issue of disability, there is no evidence that these physicians were employees of the Plan, Broadspire, or American Electric Power. There is no evidence that the fact that they were retained to review the file influenced their decisions in any way. If the mere fact that peer review physicians are paid for their services could render their opinions unworthy of credence, the same could be said of the opinions of a claimant's treating physicians, which could also be biased by the additional factor that a claimant's treating physicians are personally acquainted with the claimant through the physician-patient relationship.

Plaintiff also argues that Broadspire conducted the annual review of plaintiff's file with the express purpose of terminating his benefits. As noted previously, the Plan terms state that a beneficiary "will be required to provide continuing proof of your disability at least once each year." AR 65. The Plan routinely sent notices to plaintiff requesting this annual documentation. For example, in 2001, the Plan sent plaintiff annual review documents on December 19, 2001, and the requested documents were

received on February 25, 2002.  AR 782-783.  An annual review letter was sent on April 7, 2003, and records were received on July 3, 2003.  Ar 784.  There is nothing to in the record which would permit this court to attribute an improper motive to Broadspire's request for records in 2004, which appears to be no more than a standard annual review as permitted under the terms of the Plan.

Plaintiff argues that the Plan should have arranged for the diagnostic tests necessary to provide objective medical evidence of his disability.  However, the Plan requires a claimant to "submit satisfactory, written proof of objective medical information relating to your illness or injury which supports a functional impairment that renders you to be disabled."  Plan Summary, AR 63.  Thus, plaintiff bore the burden of producing sufficient evidence of his disability to satisfy the Plan.  See Ruttenberg v. U.S. Life Ins. Co. in City of New York, 413 F.3d 652, 663 (7th Cir. 2005)(holding that ERISA plaintiff seeking to enforce benefits under the policy bears burden of proving his entitlement to contract benefits); Seiser v. UNUM Provident Corp., 135 F3d. App'x 794 (6th Cir. April 22, 2005)(plaintiff bore burden of proving eligibility for disability benefits under terms of policy); Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 46 (3d Cir. 1993)(plaintiff bore burden under plan to substantiate claim that physical condition caused total disability by submitted medical evidence to support eligibility for benefits); Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 985 (6th Cir. 1991)(rejecting argument that once disability benefits are conferred, burden of proof lies with the insurance company to prove that employee can return to former employment).

The Plan did obtain a functional capacity evaluation and an independent psychological evaluation by Dr. McIntire.  The Plan letters and most of the peer review reports also advised plaintiff of the types of clinical information that would be helpful in reviewing his claim.  See Glenn v. Metlife, 461 F.3d 660, 672 (6th Cir. 2006)(suggesting that a benefits plan should clarify the kind of additional medical documentation that would be sufficient to establish a claimant's medical condition).  Despite the suggestions in the Plan notices and peer evaluations, plaintiff failed to secure such information.  The Plan did not act arbitrarily and capriciously by failing to arrange for diagnostic testing or other examinations suggested by the peer reviewers.

Plaintiff, citing Spangler v. Lockheed Martin Energy Systems, Inc., 313 F.3d 356 (6th Cir. 2002), argues that the Plan engaged in "cherry picking" by noting the parts of the record that weighed against a finding of disability.  However, this is not a case where relevant evidence was withheld from the claim reviewer or reviewing physicians, nor is it a case where the reviewer failed to comment on an express finding of disability by a treating physician.  The record reveals that the peer review physicians took into account all of the medical information presented by plaintiff's treating physicians.  The fact that the peer review physicians and the Plan then explained the reason for their opinions or determinations by pointing to specific information in the record which supported a finding that plaintiff did not meet the criteria for disability rather than agreeing with Dr. Dadmehr's conclusory opinion does not mean that they did not consider all of the information presented by plaintiff, nor does it render their review arbitrary and

30

capricious.

Plaintiff alleges specifically that the Plan engaged in cherry picking by taking plaintiff's psychological impairments, evidenced by Dr. McIntire's report, out of context. Plaintiff's psychological condition was evaluated by three mental health specialists as a part of the Plan's peer review. Dr. Glassman, Dr, Elana Mendelssohn, and Dr. Burstein all reviewed the reports of Dr. Stark and Dr. McIntire. They agreed that while Dr. Stark's notes documented plaintiff's subjective complaints of anxiety, irritability and other symptoms, they included no examination data that would support a functional incapacity in cognitive, emotional or behavioral functioning that would preclude plaintiff from performing any occupation. Although the examination report of Dr. McIntire acknowledged plaintiff's mental illnesses, Dr. McIntire also conducted a mental status examination and various tests which supported the opinions of the peer review specialists that plaintiff's mental illnesses would not preclude him from working. The fact that the peer review specialists and the Plan concluded, based in part on Dr. McIntire's examination notes and test results, that plaintiff was capable of working despite the diagnosis that plaintiff did have some psychological impairments did not constitute cherry picking.

Plaintiff also argues that the preparers of the Employability Assessment Report considered only the restrictions and limitations prescribed by Dr. Cohan, who stated in his report that plaintiff could perform sedentary or light duty work. The report indicates that the preparers of the report reviewed the functional capacity examination prepared by Jessica Iams, the IME of Dr. McIntire

31

(presented on the letterhead of Dr. J.T. Spare), the peer review by Dr. Vaughn Cohan, a neurologist, and the peer review performed by Dr. Barry M. Glassman, a psychiatrist. AR 179. In the functional capacity examination, Iams concluded that plaintiff was capable of performing a job with medium physical demand categories. AR 149. Dr. Glassman concluded that plaintiff "most likely would be successful in performing in a low stress, nonphysically demanding position" although "there were no examination findings to indicate this would be medically necessary." AR 218. He also agreed that no significant behavioral impairments were apparent from Dr. McIntire's evaluation. Dr. Cohan offered the opinion that plaintiff's limitations would be consistent with sedentary or light work. AR 207. The fact that the preparers of the Employability Assessment Report used the criteria which was the most restrictive of plaintiff's ability to work in determining whether there were available occupations which met those criteria actually benefitted plaintiff and did not constitute improper cherry picking.

Plaintiff also argues that the preparers of the Employability Assessment Report failed to consider plaintiff's psychological problems in assessing his ability to return to work. However, the report states that the preparers reviewed the IME of Dr. McIntire and the peer review of Dr. Glassman. AR 179. The Employability Assessment Report notes the diagnosis of plaintiff's condition as including anxiety, depression, bipolar disorder, and post-traumatic stress syndrome. AR 180. However, Dr. McIntire's report revealed that plaintiff "did not exhibit any clinically significant behavioral impairments" during his evaluation. Dr. Glassman's assessment, upon reviewing Dr. McIntire's report and Dr. Stark's

notes, was that there was "no documentation that would support a functional incapacity in the cognitive, behavioral, or emotional spheres that would preclude" plaintiff's employment in any occupation. AR 180. The court notes that even Dr. Stark, plaintiff's treating psychiatrist, gave the opinion that plaintiff might be able to perform part-time, low stress work. AR 102. The preparers of the report did not engage in cherry picking or act arbitrarily and capriciously in failing to find that the mere fact that plaintiff was diagnosed as having these conditions was sufficient to render plaintiff disabled.

Plaintiff also argues that the Plan's reliance on the lack of objective medical evidence in terminating plaintiff's benefits was arbitrary and capricious. Plaintiff also argues that the Plan failed to consider his subjective complaints of pain in evaluating his disability status.

The Plan documents in this case specifically provide that eligibility to receive benefits ends as of the "date you fail to submit satisfactory, written proof of <u>objective</u> medical information relating to your illness or injury which supports a functional impairment that renders you to be disabled." Plan Summary, AR 63 (emphasis added). In addition, the Sixth Circuit has held that a plan administrator may deny benefits when the objective medical evidence does not substantiate the plaintiff's subjective medical complaints. <u>See</u>, <u>e.g.</u>, <u>Brown v. National City Corp.</u>, 166 F.3d 1213 (unreported), 1998 WL 787084 (6th Cir. Oct. 29, 1998)(doctor's opinion, based on plaintiff's subjective complaints of pain, that plaintiff was disabled not objective medical evidence which rendered administrator's decision unfair); <u>Yeager</u>, 88 F.3d at 382

33

(subjective complaints of fatigue and joint pain did not render administrator's denial of benefits arbitrary and capricious where there was no definite anatomic explanation of plaintiff's symptoms).  A plan administrator is entitled to insist on objective evidence such as diagnostic tests to verify whether the subjective complaints are honest or attempts at malingering.  Such testing is particularly important in the case of mental illness, where treatment relies substantially on the patient's claims regarding his state of mind.

The Plan's reliance on the plaintiff's failure to present sufficient objective medical evidence supporting his disability was not arbitrary and capricious.  <u>See Oody v. Kimberly-Clark Corp. Pension Plan</u>, 215 Fed.App'x 447, 452 (6th Cir. Feb. 1, 2007)(administrator's decision upheld where "the Committee offered a reasoned explanation for its decision denying Oody benefits: he failed to submit sufficient objective evidence to establish that he was permanently and totally disabled, as defined by the Plan."); <u>Wilkins v. Baptist Healthcare System, Inc.</u>, 150 F.3d 609, 616 (6th Cir. 1998)(in the absence of objective evidence supporting plaintiff's claim of disability, administrator properly denied claim).

Many of the peer review specialists in this case noted that the reports of plaintiff's treating physicians relied in part on plaintiff's subjective complaints of pain rather than objective medical tests.  However, they also took into account plaintiff's subjective complaints of pain in their analysis.  For example, Dr. Cohan limited plaintiff to sedentary or light work due to his reports of pain.  AR 207.  He did so in spite of his observations

34

that numerous tests performed during plaintiff's functional capacity evaluation "demonstrated results suggestive of submaximal and self-limited effort" and that the finding that plaintiff was capable of performing work at a medium physical demand classification should be considered a minimum level of functionality "as he performed submaximally on many of the tests which were administered." AR 207, 208. Dr. Cimera noted plaintiff's complaints of lower back pain, but went on to note that the MRIs and other tests did not reveal any significant abnormalities which would support a loss of function. AR 675. The Plan also obtained the Functional Capacity Evaluation, in which the examiner took into account plaintiff's complaints of pain in placing plaintiff in a medium physical demand category. AR 149. Despite plaintiff's placement in this category, the preparers of the Employability Assessment Report limited their search to only sedentary jobs.

Plaintiff contends that his conditions have not improved since he was originally placed on disability, and that the Plan should be required to show that his conditions had improved to the point that he was now capable of working. Regardless of whether plaintiff's conditions had improved, plaintiff, not the Plan, bore the burden under the terms of the Plan to establish his continuing disability. Plaintiff was required "to provide continuing proof of your disability at least once each year. Objective medical evidence must be supplied supporting your case for disability." AR 65. All the Plan was required to determine was whether plaintiff currently satisfied the requirements for disability. This is not a case where the Plan relied solely on the evidence which was in the

record at the time disability benefits were awarded in denying future benefits.  Rather, the Plan relied on new and contemporaneous evidence in evaluating plaintiff's disability status, including an independent psychological evaluation, a functional capacity examination, an employability assessment report, ten peer reviews, and recent records from plaintiff's treating physicians.  Therefore, it cannot be said that the Plan's decision to deny plaintiff disability benefits in 2005 onward was inconsistent with the original finding of disability.

Plaintiff argues that the Plan should have taken into account the decision of the administrative law judge in awarding plaintiff social security benefits.  A disability determination by the Social Security Administration may be relevant in determining if a denial of benefits is arbitrary and capricious.  Glenn, 461 F.3d at 667.

The Plan argues in response that plaintiff never submitted the decision of the administrative law judge to the Plan for consideration.  In any event, it is not clear how a legal decision to award benefits in 1994 would be relevant to the determination of the Plan at issue in this case as to whether plaintiff was still disabled over ten years later, where the Plan's decision was based in large part on new information about plaintiff's current condition which was not available at the time social security benefits were awarded.

The instant case is readily distinguishable from the situation in Glenn, where the plan encouraged the plaintiff to apply for social security disability benefits to reduce the amount of benefits payable by the plan, then totally disregarded the Social Security Administration's finding of disability and declined to

36

award plaintiff disability benefits under the plan despite evidence that the plaintiff's condition had deteriorated.  Here, the Plan paid disability benefits for over twelve years before the Plan's review in the instant case.

The administrative record includes a reference to the fact that plaintiff's claim for social security disability was allowed for affective disorders and Post Traumatic Stress Disorder.  AR 107.  At least eight of the peer review specialists were given a record which included letters and information from the Social Security Administration concerning the award of benefits to plaintiff.  The decision denying plaintiff's first appeal referred to a social security administration letter dated September 20, 1994, and a social security administration notice of change in benefits dated September 13, 1995, as being documents which were reviewed.  AR 262.  The decision denying plaintiff's second appeal also referred to social security documents which were reviewed.  AR 575.  Thus, the fact that plaintiff had been awarded social security disability benefits was known to and considered by the Plan and the peer review doctors.  The Plan's decision to deny plaintiff benefits was based in large part on new information about his current medical condition which was not before the Social Security Administration when it issued its decision over ten years earlier.  The Plan did not act arbitrarily and capriciously in failing to adhere to the determination of the Social Security Administration.

V. Conclusion

Upon review of the administrative record, the court concludes that the Plan's decision to terminate plaintiff's disability

benefits is rational in light of the Plan's provisions, <u>Yeager</u>, 88 F.3d at 381, and that it is possible to offer a reasoned explanation for the Plan's decision based upon the evidence.  Under the terms of the Plan, it was plaintiff's burden to furnish the Plan with sufficient medical documentation to support a finding of disability, and the Plan could reasonably conclude, based on the documents in the administrative record, that plaintiff failed to sustain this burden.  The Plan's determination is not arbitrary and capricious.  <u>McDonald</u>, 347 F.3d at 169.  Accordingly, defendant's motion for judgment on the administrative record (Doc. No. 28) is granted.  Plaintiff's motion for judgment on the administrative record (Doc. No. 29) is denied.  The clerk shall enter judgment on the administrative record in favor of the defendant.

Date: September 30, 2008        <u>    s\James L. Graham        </u>
                                James L. Graham
                                United States District Judge